OPINION OF THE COURT
Debra Rose Samuels, J.
For the reasons stated below, respondent’s motion to dismiss pursuant to CPLR 3211 (a), which the court elects to treat as a motion for summary judgment pursuant to CPLR 3212, is denied. Petitioners’ cross motion for summary judgment in their favor is granted.
1. Summary Judgment May Properly be Granted
Respondent argues that petitioners’ cross motion for summary judgment must be denied because respondent has not yet answered, and CPLR 3212 (a) allows summary judgment only “after issue has been joined”. CPLR 3211 (c), however, provides that “Upon the hearing of a motion made under subdivision (a) or (b), either party may submit any evidence that could properly be considered on a motion for summary judgment. Whether or not issue has been joined, the court, after adequate notice to the parties, may treat the motion as a motion for summary judgment.”
No notice from the court is required, however, where “both sides make it unequivocally clear that they are laying bare their proof and deliberately charting a summary judgment course [citations omitted].” (Four Seasons Hotels v Vinnik, 127 AD2d 310, 320 [1st Dept 1987]; accord, Fourth Ave. Owners Corp. v Geshwind, 228 AD2d 370 [1st Dept 1996].) The court ñnds that the parties have indeed charted such a course, with each laying bare its proofs and offering a comprehensive, sworn account of the events that culminated in this action, and that *891 the proofs submitted do not reveal any disputed issue of material fact. Accordingly, summary judgment is appropriate.
2. The Facts
Following are the undisputed facts relevant to the court’s decision on the motion and cross motion, based on the affidavits and exhibits submitted by the parties:
Petitioners Dennis Sherman and Patricia Sherman are the tenants/cooperators of 210 Riverside Drive, apartment 7F (the Apartment). In May of this year, respondent Kim E. Hallmark, then residing in Washington, D.C., responded to a newspaper advertisement placed by the Shermans offering a sublease on the Apartment. After several weeks of on-and-off negotiations, on June 14 Ms. Hallmark and the Shermans entered into a sublease (the Sublease).
The Sublease, by its terms, was to begin on June 16, 1999, and end on August 25, 2000, but required, at paragraph 1, approval by the cooperative’s Board of Directors “before the commencement of the sublease.” The Sublease provided, at paragraph 3, for a monthly rent of $2,595 and, at paragraph 5, for a security deposit of $3,900, to be paid upon execution of the Sublease. Several days prior to the execution of the Sublease, Ms. Hallmark had sent the Shermans a check for $7,300, to cover the security deposit, the first month’s rent and various fees imposed by the cooperative.
Immediately after execution of the Sublease, the Shermans handed Ms. Hallmark a note that contained information about their itinerary during the period covered by the Sublease, and how they could be reached; a request that she forward their mail on a weekly basis by Federal Express, using Federal Express envelopes for which the Shermans had already filled out the requisite forms, with charges to be billed to the Shermans’ existing Federal Express account; a request that she periodically water their plants; information and advice about certain features of the Apartment and certain building procedures; instructions concerning the use of appliances; information about their arrangement with a cleaning woman; instructions regarding the manner in which certain kitchen items should be cleaned; and warnings and advice about certain problems that might arise.
Ms. Hallmark, at paragraph 7 of her affidavit dated July 21, 1999, characterizes that note as an attempt to impose “additional obligations relating to the occupancy of the apartment.” The accuracy of that characterization would be relevant if Ms. *892 Hallmark were seeking to break the Sublease, but is of no relevance in this action, in which Ms. Hallmark seeks to enforce the Sublease.
On the afternoon of June 15, Ms. Hallmark, back in Washington, D.C., spoke by phone with Mr. Sherman to press him to secure the Board approval that was a necessary precondition to the commencement of her subtenancy, and came away from that conversation greatly concerned that Board approval of the Sublease would not be obtained in time to permit her to begin her tenancy on June 16 and to move in three to five days later, as planned.
Later on June 15, shortly before 6:00 p.m., Mr. Sherman faxed to Ms. Hallmark at her home a letter granting the cooperative Board’s approval of the Sublease. Ms. Hallmark neglected to check for incoming faxes, however, until June 19, at which time she discovered the approval letter faxed to her on June 15.
Sometime on June 15 following her conversation with Mr. Sherman, Ms. Hallmark, concerned about both the Shermans’ apparent failure to obtain Board approval in a timely manner and what she viewed as their attempt to impose additional terms regarding her subtenancy, decided to call off the Sublease. Accordingly, she sent a letter to the Shermans, in care of their next-door neighbor, Suhashini Sankaran (who was also the cooperative officer who had signed the June 15 approval letter), stating that “The ‘terms’ verbally added by you after our signing are unacceptable * * * The deal is off.” The letter, with which were enclosed the two sets of keys the Shermans had furnished, was sent in care of Ms. Sankaran because Ms. Hallmark was not sure where to reach the Shermans, who, she understood, were already to have departed on their planned travels. Ms. Hallmark also stopped payment on her $7,300 check, which was to have covered one month’s rent, certain building fees and the $3,900 security deposit required by the Sublease.
On June 19, Ms. Hallmark finally checked her incoming faxes for the first time since her June 15 conversation with Mr. Sherman, and found the approval letter from the cooperative Board faxed to her by Mr. Sherman on June 15. Ms. Hallmark thereupon decided that she wished to take the Apartment after all (apparently no longer troubled by the onerous “additional obligations” she felt the Shermans had sought to impose). Because she- did not know how to reach the Shermans, she attempted to contact Ms. Sankaran “to explain the situation and *893 revoke the [June 15] letter,” as Ms. Hallmark put it at paragraph 19 of her July 21, 1999 affidavit. After several unsuccessful tries, she left a message to that effect on Ms. Sankaran’s answering machine.
The following day, June 20, Ms. Hallmark traveled to New York, arrived at 210 Riverside Drive and persuaded the doorman to admit her to the Apartment, showing him the Sublease and the Board’s approval letter. The parties dispute whether Ms. Hallmark misled the doorman in any way to gain entry to the Apartment. But the issue is immaterial, as the issue in this case is her right to continue occupancy of the Apartment, not whether she was guilty of illegal entry.
On June 21, the day after taking occupancy of the Apartment in the manner described above, Ms. Hallmark, now armed with a telephone number where the Shermans could be reached (which had been left in the Apartment), called the Shermans and left a voice-mail message stating that she had “revoked” her June 15 letter and taken occupancy, and intended to proceed under the Sublease. She received a return call from Mr. Sherman later that day, in which she reiterated her position.
Meanwhile, by June 20, the Shermans had reached agreement in principle on a sublease with a new prospective subtenant and were determined to proceed with that agreement, sending him a proposed sublease by Federal Express on June 21. Later on June 21, Mr. Sherman flew back to New York from Washington State, where the Shermans were vacationing.
The following morning the parties played out a lockout drama, begun when Mr. Sherman, while Ms. Hallmark was out walking her dog, entered the Apartment, accompanied by a locksmith brought along to change the locks. Ms. Hallmark returned while that work was in progress and demanded that the police be called, to which Mr. Sherman agreed. After the police officers who had responded to the scene had inspected the Sublease, Ms. Hallmark’s June 15 letter, and a copy of Ms. Hallmark’s $7,300 check bearing notations showing that the check had been stopped, they restored Ms. Hallmark to possession. She has continued in possession since that time.
3. By Stopping Her Check, Ms. Hallmark Gave the Shermans the Right to Rescind the Sublease
By stopping her $7,300 check, Ms. Hallmark deprived the Shermans of an important consideration for which they had bargained in the Sublease, thereby conferring upon the *894 Shermans the right to rescind the contract between the parties — a right they have sought resolutely to exercise, first by self-help and then by the institution of this action.
a. Security deposit was a substantial obligation of tenancy
, The furnishing of a security deposit “is a substantial obligation of [a] tenancy, as it provides a fund from which the landlord can draw for unpaid rent or damages and which puts the landlord into the status of a secured creditor [citations omitted].” (Markowitz v Landau, 171 AD2d 564, 565 [1st Dept 1991], following Glass v Janbach Props., 73 AD2d 106 [2d Dept 1980].)
b. Check is only conditional payment
Ms. Hallmark complied with the Sublease’s requirement of a $3,900 security deposit at the time of execution by tendering, in advance of execution, the $7,300 check discussed above. But the giving of a check is no more than “conditional payment,” subject to collection upon presentation of the check to the bank upon which it was issued. (Williams v Brown, 53 App Div 486, 487 [2d Dept 1900]; Rawcliffe v Aguayo, 108 Misc 2d 1027, 1029 [Sup Ct, Kings County 1981] [“It is well settled that a check is merely a conditional payment which fails upon dishonor (citations omitted)”]; Renol Holding Corp. v Lankenau, 116 NYS2d 861, 865 [Sup Ct, Westchester County 1952].)
c. Failure of consideration created right of rescission
By stopping her check, Ms. Hallmark thus rendered her original timely tender of a security deposit a nullity, as the conditional payment proved not to be a payment at all. Accordingly, she placed herself in the position of having failed to perform a substantial obligation of the Sublease: the furnishing of a security deposit before taking occupancy. That failure constituted a failure of consideration, affording the Shermans the right, at their option, to rescind. As the Court of Appeals held in Callanan v Keeseville, Ausable Chasm & Lake Champlain R. R. Co. (199 NY 268, 284 [1910]), rescission is permitted where there has been a failure of consideration, “not * * * for a slight, casual, or technical breach, but, as a general rule, only for such as are material and willful * * * Failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient.”
The continuing vitality of the 89-year-old Callanan (supra) is beyond question. It was followed by the courts in Babylon As *895 socs. v County of Suffolk (101 AD2d 207 [2d Dept 1984]) and in Septembertide Publ. v Stein & Day (884 F2d 675, 678 [2d Cir 1989]), which characterized Callanan as the “classic expression” of New York law governing rescission.
As shown above, the failure to furnish a security deposit at the time of execution of the Sublease (effected retroactively by Ms. Hallmark’s stop-payment order, which caused her bank to dishonor her $7,300 check) constituted a highly material failure of consideration — one which, by denying the Shermans their bargained-for status as secured creditors, left them in a position “substantially different from what was contracted for.”
In Rawcliffe v Aguayo (supra), the court held that a seller of real estate was entitled to rescind the contract of sale for failure of consideration, because the check tendered as payment of a contractually required down payment was returned due to insufficient funds. Notwithstanding the apparent inadvertence of this failure, and the buyer’s expressed eagerness to make good the bounced check and proceed under the contract, the court held that (at 1030-1031):
“The buyer defaulted when her check was dishonored for insufficient funds. Simply directing the seller to redeposit the check was, at best, an inadequate attempt to cure the default * * *
“A down payment under a contract for the sale of real property provides security to a seller who is thereby ‘tying up’ his property. It is much more than a mere installment. The down payment generally assures the seller that the buyer with whom he is dealing is a legitimate purchaser and, perhaps more importantly, it represents a source of reparations in the event of a breach * * * Customarily, a seller of real estate will not bind himself by contract without first receiving the down payment. It is an accepted, time-honored and essential element of the common real estate transaction.
“The making of the down payment in full has been held to be a condition precedent to any obligation on the part of the seller to be bound by a promise to convey [citations omitted] * * *
“The contract expressly specified that the down payment was to be paid ‘on the signing of the contract.’ The seller did not bargain for the buyer’s promise to pay the down payment, but rather for payment itself. Doubtless, the seller would not have executed the contract without receiving what he believed to be the down payment. Accordingly, the buyer’s nonpayment defeats her right to enforce the contract. Moreover, it consti *896 tutes a material ‘failure of consideration’ giving the seller the right to rescind the contract. (6 Williston, Contracts [3d ed], § 814.)”
Because the function of the security deposit under a lease is nearly identical to the function of a down payment under a contract for the sale of real estate, the failure to furnish a good security deposit is as material a breach as the failure to furnish a good down payment was in Rawcliffe (supra). In this case, moreover, there is the additional element of willfulness, as Ms. Hallmark’s stop-payment order with regard to her check was unquestionably purposeful, as contrasted with the apparent inadvertence of the bounced check in Rawcliffe.
4. Rescission After Failure of Consideration Moots Other
Issues Raised by Respondent
As the court has found that the Shermans had the right to rescind the Sublease — a right they promptly and decisively took steps to exercise — the question of whether Ms. Hallmark was entitled to, and effectively did, revoke her “repudiation” of the Sublease is not pertinent. A repudiation takes place when the two parties having exchanged promises, and perhaps even partial performance, one party declares its intention not to comply with its promises with respect to performance due in the future, triggering a right of the other party to sue for breach of the entire contract without waiting for that future performance to become due. (American List Corp. v U.S. News & World Report, 75 NY2d 38 [1989]; Windmuller v Pope, 107 NY 674 [1887].) Here, there was a failure of consideration that was already due, conferring upon the Shermans the right to rescind.
Similarly, Ms. Hallmark’s contention that she did not effectively “surrender” the Sublease is beside the point, as her conduct in stopping her check triggered the right to rescind, which the Shermans have exercised, rendering the issue of voluntary surrender irrelevant.
5. Judgment
Final judgment in favor of the petitioners. Warrant to issue forthwith. Execution stayed until three days after service of a copy of this order upon respondent’s counsel.
On their claim for use and occupancy, petitioners are awarded a judgment for $5,190 (two months’ rent under the Sublease), plus $85 for each day she holds over after August 20, 1999.